of minor, number 5-17-0382-385, counsel, ready. Before we get going here, Judge Moore is, he is at a seminar, and we are recording so everyone that is going to argue, please speak up so you're, otherwise you're kind of throwing your argument away. Good morning, Your Honors. May it please the Court, counsel. Assistant Appellate Defender Eun Sun Nam on behalf of the minor, Christopher B. The sole issue before this Court is the Juvenile Court's failure to comply with all of the requirements of the Juvenile Court Act before committing Christopher to the Department of Juvenile Justice pursuant to Section 5-751B. Effective 2012, Section 5-751B requires all Juvenile Courts to consider committing a minor to the DOJJ at disposition of last resort. And they mandate the Juvenile Courts to first find that commitment to the DOJJ is the least restrictive alternative. Appellate Court cases such as Henry Rahim M. and Henry P. clearly indicated that there has to be more than just an express finding on the record. This finding has to actually be based on evidence that efforts were made to locate less restrictive alternatives to secure confinement. The record should also contain the reasons why these efforts were unsuccessful. Second, Juvenile Courts must also find that secure confinement is necessary only after reviewing all seven individualized factors pursuant to the Act. In cases such as Henry Justin F. and Ronald J., Appellate Courts have found that even if one factor, there's evidence that's lacking in even one factor, the case must be remanded for full compliance with the Act. Christopher here argued both, that the Court failed to determine whether a DOJJ was the least restrictive alternative based on evidence of the efforts that were made and why the efforts were unsuccessful, and that the Court failed to consider all seven factors, the individualized factors, before committing Christopher to the DOJJ. Thus today, the focus will be on three factors, C, G, and D, in that order, and for the remainder of Christopher's arguments, we'll rely on the briefs. So Factor C is the review of the results of any assessments of the minor. Simply here, there were none. The probation officer put in the Social History Investigation Report that Christopher had self-reported a few things, that he had ADHD, bipolar disorder, and depression. He also self-reported that he had alcohol and substance abuse. The Court also heard that Christopher went to a special school because he had an IEP, or an Individualized Education Program, and Christopher also had behavioral issues. But no follow-up was ever done by the Court. No assessments or evaluations were ever given. Consider Emily Justin F. There, even after a dispositional hearing, the Court continued the case and asked for Justin's referral to an intensive probation program for further evaluation. As such, where certain assessments are needed or required, the Court has to ask for it, has to refer it, has to give it to the minor. That's the point of the Social History Report. Here, the probation department has to go figure out what actually the minor needs, what his issues are. And then afterwards, probation has to go investigate, figure out what services in the community can be fit or tailored towards this minor. Only after finding out all these results, investigating these matters, then can the probation department tell the Juvenile Court so that it can make an educated determination based on evidence. That wasn't done here. The Juvenile Court puts this burden on the courts. So the court has to make sure that it has all the evidence necessary before making its finding. Counsel, has the minor been in detention several times? No, Your Honor. Here, the minor was in predisposition. So he was never in the DOJJ. He had been in predisposition detention a few times, but that's different than being actually detained. Absolutely. But you're telling the court that there were no assessments made during the times that the minor was temporarily detained? Well, there was no evidence of it, Your Honor. So there has to be evidence presented so that the Juvenile Court can actually make that determination. We can't assume that some evaluation or assessment was done. We have to make sure that they were done and the evidence of those Does that answer your question? And what did he do? And didn't he end up in some, what's that, I can't think of the name of it right now. Didn't he have problems? Is he even there? Oh, so you're talking about the report after the fact? So after the disposition hearing. Is that correct? I'm a little confused on that. So initially he was at the Madison County Juvenile Center and there wasn't any issues there. And where did he go after that? He went, I believe, to the Youth Center in Harrisburg? No, the other one. Pierre Marquette? Yeah, Pierre Marquette. What happened there? Yeah, I think he went to one of those. Your Honor, so we are talking about the case before that time. So before you can put a juvenile into detention, you have to make sure that he belongs there in the first place. We can't talk about the things that happened afterwards because if you initially put someone in prison and then say, oh, after That's not a prison. The Youth Center, Your Honor? Yes. That is a juvenile prison. That is a juvenile detention center. So they're not behind bars. Sorry? I don't think they're behind bars. Well, you don't necessarily have to be behind bars to be incarcerated. Well, what do they do after that? You know that. We don't know that, Your Honor, because there wasn't evidence presented in the case. Does that answer your question? Mm-hmm. So that's Factor G, the services within the DOJG that can be tailored to Christopher's needs. So once again, there was no evidence here about what services or what actually happens behind the walls of the Youth Center or the detention center. But didn't I ask you, weren't there some burglaries involved here, like five of them? Yes, there were. And were there stolen cars involved here? Sorry, can you repeat that? Also a stolen car? Yes, Your Honor. The minor did state he took a car. That's what I mean. Because that's not the initial. That's what it was for, the hearing. Can you repeat that? That's what he had done, apparently. That's correct. But that's only one factor. So that's Factor B, which considers the criminal history, what the current offenses are. But the court has to make sure to go through each of the seven factors before it can make a determination. So who would consider that factor? The court did consider that factor, Your Honor. But each factor is indispensable. Each factor has to be considered, and there has to be evidence for each factor. Okay, what factor didn't the court consider? So that was Factor C, which is what I just talked about, the assessments of the minor. I'm also talking about Factor G, which was what services are provided in the DOJJ for Christopher and has to be tailored to his individualized needs. So as I said, he has a lot of mental health issues, educational issues, and alcohol and substance abuse issues. So we have to make sure that DOJJ has the services that can fit these needs. It cannot be a generalized idea that the Department of Juvenile Justice has programs. It has to be specific for Christopher. And in the case In re Ashley C, at least there the state kind of gave the court, gave the parties, a memorandum that said, I talked to four DOJJ program administrators. They said that these were services that DOJJ provided for Ashley. Here, even that bare minimum wasn't done. The state rather just argued in its argument that DOJJ has services. It will be provided to Christopher. But that's not enough. There has to be evidence. And as I said, Emily Justin F and Emily Ronald J, they state exactly that each individualized factor is indispensable. It must be considered before, you know, putting kids in prison. The third factor today is D, which is Christopher's educational background. The social history investigation report has two lines about his schooling. It said that he did not go to school, and it wasn't until he went to the Madison County Detention Center, the youth center, that he began schooling. But that's not enough. Here, Christopher and his mother came on the stand and testified briefly that he went to Nova Miss High School, which is a special school for, you know, kids with behavioral issues or IEPs. But we don't know what his IEP is. We don't know what his behavioral issues are. I think Christopher also briefly mentioned that Nova Miss had a hands-on policy, which kind of contributed to his truancy issues. So I guess the school authorities are able to put their hands on the kids in certain conditions, and he said that it wasn't helpful to his educational needs. But that evidence did come out. That did come out, but no assessments were done. No additional information was taken from the community. Could he have gone to another school? Was there another program? All right. Thank you, counsel. Thank you, Your Honor. Frankie is the court counsel. Chelsea Caston on behalf of the state. Your Honors, the Juvenile Detention Center and the Juvenile Court Act were created specifically to address the issues for young men like the juvenile in this case. It's on record that both the trial court and the state have not often seen such an extensive record of a juvenile like the one in this case. And for a trial court to make note of that is pretty significant. And it's clear from the crime spree in this case that any previous efforts to help reform this young man have been unsuccessful. The gravity of the charges alone in this case sufficiently demonstrate that services that this juvenile needs to have any hope of rehabilitation are the services that are within the Juvenile Detention Center. Not only for the young man, but also to help protect society. Your Honor, you asked about the charges in this case. There are four separate dates that were involved in this case. They're July 24th, August 11th, August 14th, and August 15th of 2016. And they do include unlawful possession of stolen vehicles, different counts of burglary, different counts of theft of a motor vehicle, as well as criminal damage to property. These are not exactly the crimes of someone who isn't in need of a lot of help and assistance to try to rehabilitate them. So that they can be a participating member of society and hopefully not end up back in the system as an adult. Was he 16, I believe? Your Honor, I believe he was 15. About to turn 16. And he said that he stole the car because he wanted to visit his father in St. Louis. Is there a pending charge in St. Louis? Is there a pending out of theft in St. Louis also or not? Your Honor, I believe that there was a pending charge. I can't remember off the top of my head. How was he rated as to his abilities in math and in reading, et cetera? Was it really poor for his age? Yes, Your Honor. He was rated at a third and fourth grade level for different educational assessments. He was already in a school specifically to address his behavioral issues. And he was in trouble with the school for truancy and other behavioral problems with the behavioral school when this happened. Was he living with his mother when most of this happened? Yes, Your Honor. I guess we would just go ahead and say he doesn't have a good relationship with his father. They're no longer together, the parents are not, and the father lived in St. Louis. At one point in time, the juvenile did live with his father and ended up homeless and on the streets of St. Louis for a while where I believe he was selling his ADHD medication on the street to make money. Additionally, Your Honors, it's on the record that the trial court specifically found that committing this individual to the juvenile detention center was the least restrictive alternative available in this case. It is an extreme example of someone who's screaming out for help. He was already on parole when this happened for a different charge. And this is a juvenile who's been in trouble since he was 9 years old. The name expressed finding that the DOJJ was the least restrictive alternative and it found that the removal of the juvenile was necessary for the protection of the public  From the record, it's clear that this was a trial court that really wanted to help this young man. They made it very clear to him, if you can show me that you're trying, we will talk about parole. But at some point, this young man has to take responsibility for his own actions. And looking at the individualized factors, Your Honor, the court specifically told him, young man, you're about to turn 16, 17 years old. At some point, while society might have failed you, you have to take responsibility for your own actions. So if you can show me that you can be a man, then we will talk about you being on parole. But right now, you have to show me that you can do that and we're going to try to get you the help that you need. Counsel, what about this argument that there's no evidence of assessments being performed on the minor or no evidence that the services at the department would actually meet the needs of the minor? Your Honor, I would specifically turn the court to page 112 of the record, where the state started to address the different factors and why it was necessary to commit the juvenile to the detention center. Specifically, they said that in addition to the fact that he was almost just not going to school because he didn't like going, they also discussed on page 113, the educational services that would be offered would provide him with the opportunity to get his GED and depending on how long he stayed there, potentially even gain an associate's degree. In addition, they discussed his physical, mental, and emotional health, specifically mentioning that he has ADHD, bipolar, and depression. Clearly, he's been assessed prior to this incident. It seemed to just be an accepted fact by all parties involved that he did have these issues that he had previously been assessed for. He said, however, those services would be available in the Department of Juvenile Justice. In the Department of Juvenile Justice, they've made up the men's section or the male section of the Department of Juvenile Justice, and it's made up into two sections. One of those sections deals appropriately with evaluating. In this specific case, Your Honor, the juvenile brought up issues with alcohol and substance abuse, which was new to the court, and so the argument of the state was, Your Honor, he can be properly assessed and evaluated and treated for that in the Department of Juvenile Justice, and we find out from the letter that is filed after this disposition hearing at C-128 that he was indeed treated before he even went to the detention center at the IYC Harrisburg location before he went to Pierre Marquette, and he did complete a substance abuse program there. So in addition to discussing the fact that he could be evaluated for his different issues, Your Honors, the state also said that they could give him health services to provide him hopefully with medication and how to not abuse his medications for bipolar, depression, and possibly his ADHD. Again, he was on medication for the ADHD, but he started selling it on the streets instead of taking it. In addition to helping him try to seek treatment for his drug abuse. Your Honors, there's nothing that says that you can't apply the same facts to different factors. It doesn't have to be seven separate set of facts that the court applies in realizing that it is in the best interest of the minor and the public that he be sent to the detention center. In addition, Your Honor, I think we can go on ahead and say that in concerning factors of subsection D, if he's already in a behavioral school and he's about to get kicked out, there's not very much else that can be offered him in society if he wasn't trying. He was starting to show improvement educationally before he was sent to the detention center. It seems that he was thirsty to learn, and he was doing well with that. And I think it was because of his improvement educationally that the trial court told him, if you can show me that you're going to be a man and that you continue to improve, then we'll talk about parole. Unfortunately, Your Honors, it's clear from the rest of the record that this young man has some other issues besides his educational disabilities, and there's some other issues that are being addressed at the detention center, including the fact that he's been in fights, and within 60 days of being in the detention center, he had 19 major infractions against him. Again, Your Honors, the state says that the Department of Juvenile Justice exists exactly to help young men like this one in the hopes that they can help reform him, protect society, and get him back out without him ending up in jail as an adult. Does the court have any other questions? We would ask that you confirm the ruling of the court. Thank you. Thank you. Your Honors, to begin, the state focuses a lot on this report from Pierre Marquet. That's after the fact. We have to go before he was sentenced to the DOJ jail. That's what we have to do. Because after you put him in there, even if he's in there erroneously, if you talk about what happens afterwards, that's not what's before this court right now. We have to go before. This argument about his infractions, all that stuff, that's all after the fact. We have to go back so that we know for sure that the juvenile court would have put him in the DOJ jail in the first place. Because with other services or other research that there's services in the community, he might not have been put in DOJ jail in the first place. Another fact I want to touch on is I think Christopher said it best. He said that he didn't want to be just another number in the system, and we have to treat him as a unique individual. We cannot just go with what the states say. Oh, DOJ jail has services for him. He's going to be assessed. DOJ jail has A, B, and C. We don't know if that's exactly what Christopher needs. We don't know what services are in the community. They talked about probation where he had a report once or twice a month and then had some drops. That's not the supervision that he needs. Christopher asked for intensive probation, but no referral was done. And if you think back to Emory Justin F., even after the fact the court made referrals for intensive probation. And I want to strongly emphasize to this court that his current offenses, his criminal history, that's only one of the seven factors. His extensive records, if we look at Emory Justin F., Emory H.L., Emory Ashley C., Emory Henry P., they're all extensive records. But because there was something that's lacking, because the juvenile court didn't consider one thing, it had to go back, it had to be remanded. So this focus on his offenses, yes, that's a factor, but that's only one of the seven. But counsel, you're not really arguing that the court didn't consider these other factors. The way I hear your argument is there was no evidence on the other factors. I mean, the court made reference to basically the services, but your argument is, well, there had to be evidence. The court could use its own knowledge of what those services are. Well, Your Honor, what services would the court be considering? Just because the court makes an express finding, that's not enough. They have to have the evidence before it so that we can see exactly why Christopher was put in the DOJ in the first place. So without services, without being like, I think in one of the cases, there was assessments made to Prairie Center or assessments made to a mental health facility or a residential facility. The court has to consider all of those. The court can't just say, I know that there's community services out there, and Christopher doesn't meet any of those requirements or he can't fit into any of those community services. It has to be before the court. The court doesn't have to say everything, but there at least has to be something before the court so that the court can consider it. An express finding is not enough. And the state also argues about the DOJG services that the state argued in argument. That's, once again, not evidence. Regarding his education, I think his teacher in the Madison County Juvenile Detention Center kind of gave him positive reviews, saying, you know, Christopher came in with a low education, but he's now thriving in school. So this actually just shows that in the right environment with the right caring educators, he could thrive. He could be a good student. It's just that he didn't like NOPAMIS because they had the hands-on policy. They repeated academic material. The educators there didn't engage him like Mrs. Klenke. So we know that if he puts his mind to it, he can do it. So once again, I want to emphasize each individual factor. Express findings are not allowed. There actually has to be evidence to back up each finding. The fact that the court is saying he considered all the factors, that's not enough. So unless there are any other questions, Christopher asks that this court vacate his commitment to the DOJG and remand for a new dispositional hearing in full compliance with the Juvenile Court Act. Thank you. Thank you. Thank you to both counsel. The court will take this matter under advisement and render a decision in due course.